**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEW MEXICO**

**MARKEL AMERICAN INSURANCE**
**COMPANY,**

        **Plaintiff,**

vs.                                                       Civ. No. 06-684 JH/RHS

**SILVA BOWLING, INC. AND ELEANOR**
**S. OCANA, individually and as Personal**
**Representative of the Estate of BENJAMIN SUAZO,**

        **Defendants.**

**MEMORANDUM OPINION AND ORDER**

      This is a declaratory judgment action regarding insurance coverage. The case comes before the Court on a motion by Plaintiff Markel American Insurance Company ("Markel") in which it requests that the Court grant it summary judgment on its claim that its insurance policy does not provide coverage to Defendant Silva Bowling, Inc. ("Silva Bowling") for claims arising out of the death of Benjamin Suazo on Silva Bowling's property. After considering the law, the insurance policy, the evidence, and the arguments of counsel, the Court concludes that the motion should be granted.

**FACTUAL BACKGROUND**

      Markel issued two insurance policies to Silva Bowling. The first, Policy No. 8521RS003502-0 ("the GCL policy"), which provides commercial general liability coverage, states:

> We will pay those sums that the insured becomes legally obligated to pay as damages because of "bodily injury" or "property damage" to which this insurance applies. We will have the right and duty to defend the insured against any "suit" seeking those damages. However, we will have no duty to defend the insured against any "suit" seeking damages for "bodily injury" or "property damage" to which this insurance does not apply.

Plaintiff's Ex. 1.  Attached to the GCL policy is an endorsement, labeled in large, bold, capital letters: "THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.  ASSAULT AND/OR BATTERY EXCLUSION."  *Id.*  The assault and battery exclusion set forth in the endorsement states:

> The coverage under this policy does not apply to any claim, suit, cost or expense arising out of assault and/or battery, or out of any act or omission in connection with the prevention or suppression of such acts, whether caused by or at the instigation or direction of any Insured, Insured's employees, patrons or any other person.  Nor does this insurance apply with respect to any charges or allegations of negligent hiring, training, placement or supervision.

*Id.*  The policy period for the GCL policy was January 21, 2005 through January 21, 2006.

The second insurance policy issued by Markel to Silva Bowling is Policy No. 4602RS272627-0 ("the umbrella policy"), which provides excess/umbrella coverage. Plaintiff's Ex. 2.  Like the GCL policy, the policy period for the umbrella policy was January 21, 2005 through January 21, 2006.  *Id.*  And, like the GCL policy, the umbrella policy contains an endorsement labeled in bold, capital letters, "ASSAULT AND BATTERY EXCLUSION."  *Id.*  This exclusion contains slightly different wording than that of the GCL policy, and provides:

> This insurance does not apply to assault and/or battery, or out of any act or omission in connection with the prevention or suppression of such acts, whether caused by or at the instigation or direction of any insured, insured's "employees," patrons or any other person.  Nor does this insurance apply with respect to any charges or allegations or negligent hiring, training, placement or supervision.

*Id.*

Daryl Wilson ("Wilson") sells property and casualty insurance for Brown & Brown, Wilson Depo. at p. 43, and he acted as Silva Bowling's insurance agent who had authority to find the best coverage for his client (Silva Bowling) in the marketplace.  *Id.* at p. 98-99.  With regard to Markel, Wilson had authority only bind the coverage proposed by the insurer to Wilson and his client, and

to collect the down payment for the insurance.[1]  *Id*.  Wilson contends that no one from Silva Bowling specifically requested assault and battery coverage in the policy.  However, this fact is in dispute, as Art Silva stated in his affidavit that when discussing coverage with Wilson, he specifically asked whether Silva Bowling would be covered for any fights that happened on its property, and that Wilson said that such coverage was included, although the policy excluded coverage for altercations between employees of Silva Bowling and its customers.  Silva Aff. at ¶ 4.  Silva also attests that he specifically asked about this coverage because the previous year there had been a fight resulting in injuries on Silva Bowling's property, and he wanted to make sure there was coverage for that situation if it arose again.  *Id*. at ¶ 5.  In any event, the application submitted by Wilson to Markel contained no request for assault and battery coverage.  Kolesar Aff. at ¶ 6 and Ex. 3 thereto.  Thereafter, Markel prepared a written proposal of coverage for Silva Bowling and presented it to Wilson.  The proposal lists a summary of premiums for various types of coverages and states that coverage is subject to an assault and battery exclusion.  *Id*. at ¶ 7 and Ex. 4 thereto.  The record contains no evidence as to whether or not Silva Bowling ever received the written proposal.[2]  Markel delivered the bound policy to Wilson in March of 2005, approximately two

---

[1] In his affidavit, Art Silva, President of Silva Bowling, states that he "understood Mr. Wilson was representing both Silva Lanes, Inc. and the insurance company."  Silva Aff. at ¶ 9.  However, Mr. Silva sets forth no factual basis for his understanding of the relationship between Markel and Wilson, and therefore it is impossible to determine whether Mr. Silva made an assumption or was speculating, or if his understanding was based upon facts of which he had personal knowledge.

[2] Although Markel asserts in its "statement of undisputed material facts" that Wilson presented the written proposal to Silva Bowling, the Wilson deposition testimony cited by Markel does not support that statement.  Instead, Wilson testified that he made a proposal to Silva Bowling based upon the written proposal he received from Markel; he does not state that he ever gave anyone from Silva Bowling a copy of the written proposal.  Wilson Depo. at p. 80.  Similarly, while Silva Bowling denies that it ever received the written proposal, it cites no affidavits or deposition testimony in support of that assertion.

months into the coverage period. Wilson did not deliver the policy to Silva Bowling until June or July of 2005.

On October 20, 2005, an altercation in the Silva Bowling parking lot in Santa Fe, New Mexico, resulted in the death of Benjamin Suazo ("Suazo"). Plaintiff Eleanor S. Ocana ("Ocana), individually and as personal representative of Suazo's estate, filed her First Amended Complaint in the First Judicial District Court, Santa Fe County, New Mexico, in which she alleged that several traveling salesmen "attacked" Suazo in Silva Bowling's parking lot and, as they were leaving Silva Bowling's premises, "drove over Benjamin Suazo while he lay on the ground, killing him." Plaintiff's Ex. B at ¶¶ 19-20. In her Fifth Cause of Action, Ocana asserts a claim against the traveling salesmen for battery, alleging that the salesmen "intentionally touched or applied force to Decedent by striking him with their fists, hands, and feet," that the salesmen acted in a rude, insolent, or angry manner, and that "as a direct and proximate result" of this conduct, Suazo "sustained fatal injuries with permanent damages." *Id*. at ¶¶ 53-55. *See also* Paragraph 57 of the First Amended Complaint, which alleges that the salesmen violated several criminal statutes, including those for assault and battery. *Id*. at ¶ 57.

With regard to Silva Bowling, Ocana alleges that Silva Bowling negligently served alcohol to the salesmen when it was reasonably apparent that they were intoxicated, that Silva Bowling had only one security guard on duty, that the guard never went out into the parking lot until after Suazo was lying beaten on the ground, and that he failed to protect Suazo, failed to provide Suazo with proper medical attention, and failed to prevent his death. *Id*. at ¶¶ 18, 25-26. Ocana's legal claims against Silva Bowling include, inter alia, negligent failure to provide a safe premises, failure to provide adequate security, failure to property train its employees, failure to properly hire competent employees, failure to adequately supervise its employees, failure to protect Suazo from or warn him

of a known danger, as well as wrongful death, negligently serving alcoholic beverages, and a *per se* violation of New Mexico statutes regarding the sale of alcoholic beverages. *Id.* at ¶¶ 28-33, 63-66.

Silva Bowling has presented evidence from the criminal trial of Jason Furden, the driver of the vehicle that ran over Suazo, to the effect that Furden did not intend to run over Suazo. Defendant's Ex. 3 and attachments thereto. Silva Bowling has also presented testimony from Dr. Ross Reichard of the Office of the Medical Investigator, who stated that Suazo probably would have survived the injuries from the altercation, and that Suazo died from the crushing injuries he sustained when he was run over. Reichard Depo. at p. 30.

Markel is defending Silva Bowling in Ocana's state court action under a reservation of rights. In its Amended Complaint [Doc. No. 14], Markel asks for a judgment declaring that the GCL and umbrella policies do not provide coverage to Silva Bowling for claims arising from the death of Suazo, including those claims brought by Ocana. Arguing that it has no duty to defend or to indemnify Silva Bowling, Markel moves for summary judgment on its Amended Complaint.

## **LEGAL STANDARD**

Under Rule 56(c), summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). "In applying this standard, we view the evidence and draw reasonable inferences therefrom in the light most favorable to the nonmoving party." *Burke v. Utah Transit Auth. & Local 382*, 462 F.3d 1253, 1257 (10th Cir. 2006) (quotation omitted). Under Rule 56(c), "the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242,

247-48 (1986). Rather, "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Id.* at 248.

To carry its initial burden, the moving party need not negate the nonmoving party's claim. *See Allen v. Muskogee, Okl.*, 119 F.3d 837, 840 (10th Cir. 1997), *cert. denied sub nom. Smith v. Allen*, 522 U.S. 1148 (1998). "'Instead, the movant only bears the initial burden of 'showing'—that is, pointing out to the district court—that there is an absence of evidence to support the nonmoving party's case.'" *Id.* (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986)). Once the moving party meets its burden, the nonmoving party must "go beyond the pleadings and by [its] own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'" *Celotex*, 477 U.S. at 324 (quoting Fed. R. Civ. P. 56(e)). A plaintiff cannot rely upon conclusory allegations or contentions of counsel to defeat summary judgment but rather must produce some specific factual support of its claim. *See Pueblo Neighborhood Health Centers, Inc. v. Losavio*, 847 F.2d 642, 649 (10th Cir. 1988); *Fritzcshe v. Albuquerque Mun. Sch. Dist.*, 194 F. Supp. 2d 1194, 1206 (D.N.M. 2002). "Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine issue for trial.'" *Matsushita Elec. Indus. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (citation omitted).

## DISCUSSION

## I.     COVERAGE UNDER THE TERMS OF THE WRITTEN POLICIES

The Court concludes that under the clear and unambiguous terms of the GCL and umbrella policies, Markel has no duty to indemnify Silva Bowling. In that respect, this case is like *Barth v. Coleman*, 118 N.M. 1, 878 P.2d 319 (1994), in which plaintiff was injured during a barroom fistfight she had with another patron. Plaintiff sued the bar and its manager for her injuries, alleging

6

negligence, breach of the duty of care to keep the premises safe, and failure "to otherwise stop or control the incident." *Id*. at 1.  At trial, the bar and manager were found liable on plaintiff's claims. On appeal, the New Mexico Supreme Court confronted the issue of coverage under the bar's liability policy, which contained an assault and battery exclusion virtually identical to the exclusions in this case.  The court concluded that the express terms of the policy, standing alone, created no coverage. The court stated stated: "In this case, there is no ambiguity caused by the language of the policy itself.  The policy clearly excluded coverage for assault and battery.  Barth's damages resulted from an assault and battery.  Under the literal terms of the policy, Barth's damages would not be covered." *Id*. at 5.

The same is true here.  Ocana's claims against Silva Bowling all arise from the alleged battery by the salesmen against Suazo.  If the salesmen had not battered Suazo and left him lying on the ground, then Suazo would not have been run over by the salesmen's vehicle, whether intentionally or unintentionally.  New Mexico's Uniform Jury Instruction on proximate cause specifically applies to such situations, and states:

> An act is a "cause" of injury if it contributes to bringing about the injury, and if injury would not have occurred without it.  It need not be the only explanation for the injury, nor the reason that is nearest in time or place.  It is sufficient if it occurs in combination with some other cause to produce the result.  To be a "cause", the act, nonetheless, must be reasonably connected as a significant link to the injury.

N.M. R. Ann., Civ. UJI 13-305.  The facts regarding the altercation as alleged in Ocana's Amended Complaint meet this standard for proximate cause because the initial battery, combined with the negligent act of the salesmen driving the car over Suazo, caused his fatal injuries.  Suazo would not have sustained those fatal injuries without the initial battery, and therefore his death "arises from" the battery.

Silva Bowling overlooks the fact that the salesmen's act of running over Suazo was part of the same continuous chain of events that began with the battery against him. Instead, Silva Bowling urges the Court to look at the automobile collision in a vacuum, arguing that because Furden did not intend to run over Suazo, and because the injuries Suazo received in the beating were not the cause of death, it was not an act of battery that ultimately killed him. According to Silva Bowling's reasoning, Ocana's claims against it arise from the unintentional act of running over Suazo, not from an intentional battery, and therefore the assault and battery exclusions do not apply. However, the policy exclusions bar not only claims *of* assault and battery, they also exclude any claim *arising out of* assault and battery. New Mexico courts have long given the phrase "arising from" in insurance policies a broad interpretation. *See Baca v. N.M. State Hwy. Dep't*, 82 N.M. 689, 692, 486 P.2d 625, 628 (Ct. App. 1971) ("The words 'arising out of' are very broad, general and comprehensive terms, ordinarily understood to mean 'originating from,' 'having its origin in,' 'growing out of' or 'flowing from.'").

Therefore, the Court concludes that the assault and battery exclusions in the GCL and umbrella policies apply to claims like Ocana's that sound in negligence but arise from a battery committed by the salesmen. *See also Essex Ins. Co. v. Vincent*, 52 F.3d 894, 897-98 (10th Cir. 1995) (similar assault and battery exclusion barred coverage of claims for negligent hiring and supervision claim against operator of halfway house, a resident of which escaped and committed murder).

## II.     REASONABLE EXPECTATION OF THE INSURED

"When deciding whether an exclusionary clause is effective to nullify coverage under an insurance policy, we give consideration to the reasonable expectations of the insured." *Barth*, 118 N.M. at 5 (citing *Knowles v. United Servs. Auto. Ass'n*, 113 N.M. 703, 705, 832 P.2d 394, 396

(1992)). The doctrine of reasonable expectations applies "when the language of an insurance policy or representations of the insurance company lead an insured to reasonably expect coverage." *Berlangieri v. Running Elk Corp.*, 132 N.M. 92, 96 (Ct. App. 2002).

Silva Bowling argues that it is entitled to coverage because it had a reasonable expectation of coverage, relying heavily upon *Barth*, 118 N.M. at 1. *Barth*, however, does not control here with regard to the "reasonable expectation" analysis. The insured in that case had specifically requested insurance that would cover fights among patrons at his nightclub, but in order to obtain such coverage the insurance broker had to use surplus lines insurance.[3] After a series of transactions through intermediaries, the policy that the broker ultimately obtained for the nightclub owner did not have such coverage. Furthermore, the broker did not deliver the policy to the insured prior to the fight which resulted in the injury, although the injury was found to have arisen from an assault and battery. In finding coverage, the *Barth* court concluded that the nightclub owner had a reasonable expectation that the policy would conform to the coverage he specifically requested, even though his expectations "were in large degree created by the intermediaries involved in the transaction," 118 N.M. at 6, rather than by the insurance company itself. In reaching its conclusion, the court relied on several factors. First, the nightclub owner specifically requested coverage for assaults and batteries among patrons, but when his insurance broker took over the process of obtaining that coverage through the surplus lines system, the owner "was left uninformed about the nature of what he was purchasing, how the policy was being procured, and which company he was

---

[3] "Surplus lines insurance is insurance placed with a qualified foreign insurer not otherwise authorized to sell insurance in New Mexico. Surplus lines insurance will be sold to an insured if the particular amount of type of insurance sought to be purchased cannot be obtained from insurer authorized to do business in this state." *Barth*, 118 N.M. at 5 (internal citations and quotations omitted).

purchasing the policy from." *Id*. at 6.   Second, no one provided the nightclub owner with a copy of his policy or any relevant information about coverage before the incident in question. *Id*. Therefore, he had no opportunity to review the policy and discover that it did not contain the coverage he had explicitly requested. Third, contrary to New Mexico law, the policy did not clearly identify the surplus lines insurer. *Id*.  Under these circumstances, the court concluded that the nightclub had a reasonable expectation that the policy issued by the surplus lines insurer would conform to the coverage that the owner had requested. *Id*.

In contrast to *Barth*, this case does not involve surplus lines insurance in which insured is completely removed from the process of obtaining the insurance. Rather, Silva Bowling was dealing with its insurance broker, with whom it had a prior relationship and of whom it could have asked questions regarding the insurer and the coverage under the policy. In addition, the record before the Court contains no evidence that either Wilson or the policy documents themselves withheld the name of the insurance company issuing the policy to Silva Bowling. This case differs from *Barth* in a third, and even more important, respect. While Mr. Silva did testify in his Affidavit that he conveyed to Wilson his desire that this policy contain the same assault and battery coverage as provided by Silva Bowling's previous insurer, it is undisputed that Silva Bowling had the policy in its possession for several months prior to the date of loss—the time between receiving the policy in June or July of 2005 and the incident in question on October 20, 2005. Thus, Silva Bowling had ample opportunity to review the policy, discover the well-marked assault and battery exclusion, and address the matter with either Wilson or Markel.

Silva Bowling disputes that it had a duty to review the written policy. *See* Doc. No. 71 at p. 4, ¶ 6. However, Silva Bowling cites no authority and provides no reasoning in support of this legal argument. In response to Silva Bowling's argument, Markel points out that in *Berlangieri v.*

10

*Running Elk Corp.*, 2002-NMCA-046, ¶ 25, 132 N.M. 92, 98, the court observed that an insured could have no reasonable expectation of coverage when it had ample opportunity to have examined the policies, which contained "unmistakable exclusions set out in reasonably sized print. They must be held bound by the exclusion in a policy they failed to review." *Id.* Thus, the Court concludes that Silva Bowling did have a duty to review the policies, which contained clear, well marked exclusions for assault and battery.

In short, the Court finds no reasonable expectation of coverage by Silva Bowling.

## III.   THE DUTY TO DEFEND

The duty to defend is separate and distinct from the duty to indemnify. *Knowles v. United Servs. Auto. Ass'n*, 113 N.M. 703, 704, 832 P.2d 394, 395 (1992). To determine whether an insurer has a duty to defend, the Court examines the nature of the allegations in the underlying complaint filed against its insured to determine if it states facts which bring the case within the coverage of the policy. *See Foundation Reserve Ins. Co. v. Mullenix*, 97 N.M. 618, 619, 642 P.2d 604, 605 (1982). The duty to defend can arise from the allegations of the complaint or from known but unpleaded facts that bring the claim arguably within the scope of coverage. *Am. Gen. Fire & Cas. Co. v. Progressive Cas. Co.*, 110 N.M. 741,t 744, 799 P.2d 1113, 1116 (1990); *see also Servants of the Paraclete, Inc. v. Great Am. Ins. Co.*, 857 F.Supp. 822, 832 (D.N.M.1994) (Parker, J.) ("In deciding whether an insurer is obligated to defend, the [c]ourt must determine whether the injured party's complaint contains allegations or state[s] facts that bring the case within the coverage of the policy."), *amended on reconsideration in part on other grounds*, 866 F.Supp. 1560 (D.N.M.1994). If the duty to defend does not arise from the complaint on its face, the duty may arise if the insurer is notified of factual contentions or if the insurer could have discovered facts, through reasonable investigation, implicating a duty to defend. *G & G Servs., Inc. v. Agora Syndicate, Inc.*,

2000-NMCA-003, ¶¶ 25-26, 128 N.M. 434; *Martin v. W. Am. Ins. Co.*, 1999-NMCA-158, ¶ 12, 128 N.M. 446 ("[A]ll facts known to the insurer or of which the insurer should reasonably be aware based on the facts and circumstances available to it or that it should reasonably investigate should be considered in determining the insurer's duty."). Facts that are known but unpleaded may bring a claim within the policy coverage at a later stage in the litigation. *Miller v. Triad Adoption & Counseling Servs., Inc.*, 2003-NMCA-055, ¶ 9, 133 N.M. 544.

Ocana's First Amended Complaint triggers no duty to defend by Markel. The Amended Complaint expressly alleges a claim for battery against the salesmen and specifically contends that Suazo sustained fatal injuries as a direct and proximate result of that battery.[4] These allegations place Ocana's claims against Silva Bowling directly within the reach of the assault and battery exclusions, which exclude coverage for claims arising out of an assault or battery. For her claims against Silva Bowling, Ocana alleges that Silva Bowling committed certain negligent acts or omissions (e.g., negligent hiring, training, and supervision, failure to warn, negligent service of alcohol, etc.) that either facilitated or failed to prevent the battery by the salesmen. Several of these claims—negligent hiring, training, and supervision—are specifically enumerated in both policies' assault and battery exclusions and are excluded on that basis alone. However, the unambiguous wording of both exclusions applies to not only these three claims, but also to each of the remaining claims against Silva Bowling because each claim arises from an alleged battery, or from Silva Bowling's alleged "act or omission in connection with the prevention or suppression" of the battery against Suazo. In short, Markel has no duty to defend because both of the exclusions discussed

---

[4] Inexplicably, Silva Bowling contends that Ocana's First Amended Complaint does not allege that Suazo died as a result of a battery. *See* Doc. No. 71 at p. 2. However, Paragraphs 53 to 55 of Ocana's First Amended Complaint belie Silva Bowling's argument, as they contain allegations that Suazo sustained fatal injuries as a direct and proximate cause of the battery.

above clearly and unambiguously apply not only to claims of assault and battery, but also apply to all other claims arising from an incident of assault or battery (or failure to prevent such an incident), whether the assault and battery was committed by the insured, an employee of the insured, or a patron of the insured.

Silva Bowling relies upon evidence outside of Ocana's First Amended Complaint as a basis for Markel's alleged duty to defend. Specifically, Silva Bowling points to sworn testimony by Furden that he did not intend to run over Suazo, and testimony by the coroner that it was most likely the resulting crushing injuries that killed Suazo, rather than the injuries he received in the altercation with the salesmen. However, as explained in Part I, supra, this evidence does not alter the fact that Ocana's claims against Silva arise from the battery on Suazo because they are all part of the same set of continuous events.

Finally, Silva Bowling argues, in a very conclusory manner, that "Ocana's claims against Silva Bowling in the First Amended Complaint include claims that are covered by the Markel policies . . ." Doc. No. 71 at p. 7. However, Silva Bowling does not identify the claims it contends to be covered by the policies, nor does it explain why those claims are covered. Accordingly, Markel's motion for summary judgment will be granted.

**IT IS THEREFORE ORDERED** that *Markel American Insurance Company's Motion for Summary Judgment* [Doc. No. 60] is **GRANTED**.

_____
UNITED STATES DISTRICT JUDGE